**Michigan Supreme Court**
**Lansing, Michigan**

Chief Justice:          Justices:
Elizabeth T. Clement    Brian K. Zahra
                        David F. Viviano
                        Richard H. Bernstein
                        Megan K. Cavanagh
                        Elizabeth M. Welch
                        Kyra H. Bolden

# Syllabus

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

STOKES v SWOFFORD
SELLIMAN v COLTON

Docket Nos. 162302 and 163226. Argued October 4, 2023 (Calendar Nos. 1 and 3). Decided July 25, 2024.

In Docket No. 162302, Joelynn T. Stokes, as personal representative of the estate of Linda Horn, brought a negligence action in the Oakland Circuit Court against Michael J. Swofford, D.O., and Southfield Radiology Associates, PLLC, alleging medical malpractice in connection with the care Horn received before her death. Horn was a young woman who suffered from severe headaches due to excess fluid surrounding her brain. To relieve the fluid pressure, a shunt catheter was implanted in her head on February 22, 2013. Several days later, she went to the emergency room after experiencing a headache, nausea, and vomiting. The emergency room physician ordered a brain scan, and Dr. Swofford verified the results of the scan. After receiving the results of the scan, emergency room physicians performed a procedure to relieve pressure on Horn's brain. Nevertheless, Horn's condition continued to deteriorate, and she died on March 4, 2013. Plaintiff attached an affidavit of merit executed by Scott B. Berger, M.D., Ph.D., a licensed medical physician who was a board-certified specialist in the field of neuroradiology, and the affidavit of merit contained averments that mirrored the allegations in the complaint. Defendants filed their answer and an affidavit of meritorious defense executed by Dr. Swofford, in which he averred that he was a board-certified diagnostic radiologist at the time of the events giving rise to plaintiff's action and that he had provided treatment equivalent to that performed by a reasonable board-certified diagnostic radiologist of ordinary learning, judgment, and skill under the same or similar circumstances with respect to the interpretation of Horn's brain scan. Plaintiff moved to confirm that neuroradiology was the one most relevant specialty or subspecialty for purposes of qualifying an expert. The trial court, Cheryl A. Matthews, J., denied plaintiff's motion and ruled that under *Woodard v Custer*, 476 Mich 545 (2006), the one most relevant specialty in this case was diagnostic radiology. The court denied plaintiff's motion for reconsideration, and plaintiff appealed. The Court of Appeals, MARKEY and FORT HOOD, JJ. (BOONSTRA, P.J., concurring), reversed, applying *Woodard* and determining that the most relevant specialty was neuroradiology because Dr. Swofford was evaluating a scan of the decedent's brain at the time of the alleged malpractice. Because Dr. Swofford was practicing neuroradiology, the plaintiff's expert, a neuroradiologist, was able to testify because he was certified in that subspecialty and devoted a majority of his time to practicing neuroradiology. 334 Mich App 281 (2020). Defendants sought leave to appeal, and the Supreme Court ordered oral argument on the application. 508 Mich 959

(2021). After hearing oral argument, the Supreme Court granted the application for leave to appeal and directed that oral argument be scheduled together with *Selliman v Colton*, Docket No. 163226. 510 Mich 1119 (2022).

In Docket No. 163226, Antonio Selliman brought a negligence action in the Oakland Circuit Court against Jeffrey J. Colton, M.D.; Jeffrey J. Colton PLLC; and the Colton Center, alleging that Dr. Colton's medical malpractice in performing multiple rhinoplasties on plaintiff resulted in a nasal deformity. Dr. Colton had certifications in otolaryngology, a specialty listed by the American Board of Medical Specialties (ABMS), and an additional certification from the American Board of Facial Plastic and Reconstructive Surgery. The plaintiff proposed Dr. Michael J. Armstrong as his standard-of-care expert. Dr. Armstrong had the same certifications as Dr. Colton. Plaintiff argued that the applicable standard of care in the malpractice action was otolaryngology, whereas defendants argued that the procedure at issue was a cosmetic rhinoplasty, and therefore the specialty at issue was facial plastic and reconstructive surgery. Defendants argued that Dr. Armstrong's deposition testimony showed that he did not devote a majority of his professional time to the active clinical practice or instruction of facial plastic and reconstructive surgery and that he thus failed to meet the requirements of MCL 600.2169(1). The trial court, Jeffery S. Matis, J., denied the motion to strike Dr. Armstrong's testimony without prejudice, noting that the record conflicted as to how to assign percentages to the time Dr. Armstrong spent on functional versus cosmetic procedures. In an unpublished per curiam opinion, the Court of Appeals, MARKEY, P.J., and M. J. KELLY and SWARTZLE, JJ., reversed, holding that the trial court had abused its discretion by denying the motion. Applying *Woodard*, the Court of Appeals determined that Dr. Colton was practicing facial plastic and reconstructive surgery at the time of the alleged malpractice and that Dr. Armstrong therefore could not testify because he spent a majority of his professional time practicing otolaryngology. Plaintiff sought leave to appeal, and the Supreme Court ordered oral argument on the application. 509 Mich 960 (2022). After hearing oral argument, the Supreme Court granted the application for leave to appeal and directed that oral argument be scheduled together with *Stokes v Swofford*. 510 Mich 1119 (2022).

In an opinion by Justice WELCH, joined by Justices BERNSTEIN, CAVANAGH, and BOLDEN, the Supreme Court *held*:

The test adopted by the *Woodard* Court regarding the evaluation of specialists in medical malpractice actions was inconsistent with the statutory language in MCL 600.2169. Specifically, *Woodard* incorrectly conflated the terms "specialty" and "subspecialty" in a manner that was inconsistent with the plain language of the statute, and it essentially negated MCL 600.2169(2) and (3), which provide significant discretion to trial courts to exclude experts even when those experts qualify under MCL 600.2169(1). Accordingly, *Woodard* was overruled in part. With respect to medical malpractice claims filed against physicians, the words "specialist" and "specialties" as used in MCL 600.2169(1) were defined as the specialties recognized by the ABMS, the American Osteopathic Association (AOA), the American Board of Physician Specialties (ABPS), or other similar nationally recognized umbrella-based physician certifying entities. Further, the "matching" requirement under MCL 600.2169 follows the listed general board certifications, which are the baseline "specialties" recognized by such entities for certification purposes. MCL 600.2169 does not require matching of subspecialties. Trial courts are required to ensure that experts with matching specialties under MCL 600.2169(1) meet other

criteria set forth in MCL 600.2169(2), and MCL 600.2169(3) provides trial courts with broad discretion in assessing experts.

1. In a medical malpractice action, the plaintiff bears the burden of proving (1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury. The standard of care is controlled by how other physicians in a field of medicine would act when providing the same treatment. Expert testimony is required to establish the applicable standard of care and a breach of that standard. MCL 600.2912d(1) mandates that the plaintiff in a medical malpractice action file with the complaint an affidavit of merit signed by a health professional who the plaintiff's attorney reasonably believes meets the requirements for an expert witness under MCL 600.2169. These requirements include, under MCL 600.2169(1), that the person be licensed as a health professional in this state or another state and, if the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the alleged medical malpractice in the same specialty as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board-certified, the expert witness must be a specialist who is board-certified in that specialty. Also, during the year immediately preceding the date of the occurrence that is the basis for the claim or action, the person must have devoted a majority of their professional time to either or both (1) the active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty, or (2) the instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty. *Woodard* noted that MCL 600.2169 makes clear that a physician can be a specialist who is not board-certified and that a "specialist" is somebody who can potentially become board-certified. *Woodard* then held that if the defendant physician was practicing a particular branch of medicine or surgery in which one can potentially become board-certified at the time of the alleged malpractice, then the plaintiff's expert must have practiced or taught the same particular branch of medicine or surgery for a majority of their time in the preceding year. Furthermore, if a defendant physician specializes in a subspecialty and was certified in and practicing that subspecialty, the plaintiff's expert witness must be certified in the same subspecialty as the defendant physician. *Woodard* also held that a person cannot devote a majority of their professional time to more than one specialty and that therefore, in order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of their professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty.

2. *Woodard* erred by conflating the terms "specialty" and "subspecialty," effectively reading additional text into the plain language of MCL 600.2169(1). "Specialties" and "subspecialties" are linguistically distinctive and separate terms, and they are also technical terms within the practice of medicine that require a technical definition. *Woodard* correctly defined a "specialty" as a particular branch of medicine or surgery in which one can potentially become board-certified, but a medical subspecialty is a concentrated area of knowledge and skills existing

"within a specialty" requiring additional training and education. While MCL 600.2169 lacks a specific definition of the term "specialty," the term is also used in several other statutes related to the medical profession and, in those contexts, is specifically tied to board certification. While the ABMS, the AOA, and the ABPS are the leading and most well-accepted sources of board certifications for physicians in the United States, there are several other general and niche board certifications offered to physicians through organizations that are not affiliated with one of these three entities. These too may be defined as specialties or subspecialties depending on the requirements for those certifications, such as whether an umbrella certification is a prerequisite to obtaining a narrower niche certification. In sum, the "matching" required by MCL 600.2169(1) is limited to general board specialties and does not require precise matching of subspecialties.

3. *Woodard* also erred by failing to analyze MCL 600.2169 in its entirety, focusing only on Subsection (1) and neglecting the "checks and balances" effect of Subsections (2) and (3). Concerns that doing away with consideration of subspecialties for purposes of the matching requirement would mean that, for example, a pulmonologist would be qualified to testify against a cardiologist, ignore MCL 600.2169(2) and (3), which give the trial court discretion on whether to accept the expert as qualified to provide testimony in a particular case even if the expert specialties "match" under MCL 600.2169(1). Under MCL 600.2169(2), the trial court must evaluate the educational and professional training of the expert witness, their area of specialization, the length of time they have been engaged in the active clinical practice or instruction of the health profession or the specialty, and the relevancy of their testimony; and under 600.2169(3), the trial court retains the power to disqualify an expert witness on grounds other than the qualifications set forth in MCL 600.2169.

4. Principles of stare decisis favored partially overruling *Woodard*. When an opinion has been determined to have been wrongly decided, the Supreme Court considers whether that opinion defies practical workability, whether reliance interests would work an undue hardship if it were overruled, and whether it is no longer justified in light of changes in the law or facts. The application of *Woodard*'s interpretation of MCL 600.2169 defied practicable workability by leading to inconsistent and untenable results in subsequent cases, its overruling would not deny litigants their interest in securing appropriate experts because that right is guaranteed by statute and litigants can adjust to the new holding when obtaining experts, and while there has been no significant change in the law or facts, the aforementioned reasons showcased the instability of the decision and its lack of justification moving forward.

5. In *Stokes*, the one most relevant specialty was diagnostic radiology because it was the only specialty that defendant held and practiced. Dr. Berger, plaintiff's proposed expert, spent 100% of his time practicing diagnostic radiology, and thus satisfies the requirements under MCL 600.2169(1) to testify as an expert in the case against Dr. Swofford. While the Court of Appeals reached the right result in deeming Dr. Berger fit to testify, it erred by basing this result on the conclusion that the relevant specialty was neuroradiology and that Dr. Berger was therefore qualified because he spent a majority of his time as a neuroradiologist. Instead, he was qualified because his subspecialty of neuroradiology was subsumed within the broader specialty of diagnostic radiology.

6. In *Selliman*, the Court of Appeals reached an irreconcilable result when it decided to exclude Dr. Armstrong as an expert on the sole basis of Dr. Armstrong's testimony as to the reason he performed his surgeries. Dr. Colton and the plaintiff's proposed expert were identically board-certified in otolaryngology and facial plastic and reconstructive surgery. Yet, because Dr. Colton categorized the procedure as cosmetic and not functional, the Court of Appeals deemed Dr. Armstrong unqualified to testify pursuant to *Woodard*. The Court of Appeals found that Dr. Armstrong testified that 10% of his practice involved facial plastic and reconstructive surgery procedures and 90% involved otolaryngology procedures. The Court of Appeals concluded that the most relevant specialty in the malpractice action was facial plastic reconstructive surgery and thus held that Dr. Armstrong could not testify because he spent a majority of his professional time practicing otolaryngology and not facial reconstructive surgery. Facial plastic and reconstructive surgery is a certification available to physicians once they obtain a board certification in either otolaryngology or plastic surgery, seemingly operating like a subspecialty. Whether facial plastic and reconstructive surgery is a subspecialty rather than a specialty is a fact-intensive inquiry best reserved for the trial court, with the option of an evidentiary hearing as needed, to consider factors that would be relevant to the medical community in making this determination. *Selliman* was remanded to the trial court to conduct this inquiry.

In *Swofford*, the Court of Appeals judgment was affirmed in part and reversed in part, and the case was remanded to the trial court for further proceedings.

In *Selliman*, the Court of Appeals judgment was reversed, and the case was remanded to the trial court for further proceedings.

Chief Justice CLEMENT, joined by Justices ZAHRA and VIVIANO, dissenting, disagreed with the majority's substantive arguments regarding the merits of *Woodard*, stating that *Woodard* correctly defined "specialty" as including "subspecialty." She noted that the majority's conclusion that the requirements in MCL 600.2169 do not apply to subspecialties and subspecialists was supported by slim reasoning, particularly the observation that the Legislature had used the word "subspecialty" in an unrelated statute. As *Woodard* explained, the definition of "specialty" encompasses subspecialties as well, and while the Legislature could have been clearer by referring to "the same specialty or subspecialty" in MCL 600.2169(1), it did not need to do so because a subspecialty is a type of specialty. Chief Justice CLEMENT also was not convinced that specialties and specialists should be as definitively tied to board certifications as the majority opinion held they should be, particularly given that the majority drew on definitions of "board certified" from unrelated statutes that specifically limited the applicability of their definitions. Chief Justice CLEMENT also did not agree that *Woodard* erred by preventing trial courts from exercising the discretion allotted to them under MCL 600.2169(2) and (3). She would not have partially overruled *Woodard* because of stare decisis concerns and because she believed its rules were more administrable than those the majority put forward. She would have affirmed the Court of Appeals in both cases.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 25, 2024

STATE OF MICHIGAN

SUPREME COURT

JOELYNN T. STOKES, Personal
Representative of the ESTATE OF LINDA
HORN,

        Plaintiff-Appellee,

v                                      No. 162302

MICHAEL J. SWOFFORD, D.O., and
SOUTHFIELD RADIOLOGY ASSOCIATES,
PLLC,

        Defendants-Appellants.

ANTONIO SELLIMAN,

        Plaintiff-Appellant,

v                                      No. 163226

JEFFREY J. COLTON, M.D., JEFFREY J.
COLTON, PLLC, and COLTON
CENTER,

        Defendants-Appellees.

BEFORE THE ENTIRE BENCH

WELCH, J.

In these medical malpractice cases, we clarify the standard of care requirements for expert medical witnesses under MCL 600.2169, as interpreted in *Woodard v Custer*, 476 Mich 545, 719 NW2d 842 (2006). We conclude that *Woodard* was in part wrongly decided and must be overruled in part because the test adopted by the *Woodard* Court regarding the evaluation of specialists in medical malpractice actions is inconsistent with the statutory language in MCL 600.2169. Specifically, *Woodard* incorrectly conflated the terms "specialty" and "subspecialty" in a manner that is inconsistent with the plain language of the statute, and it essentially negated MCL 600.2169(2) and (3), which provide significant discretion to trial courts to exclude experts even when such experts qualify under Subsection (1). We hold that with respect to medical malpractice claims filed against physicians, the words "specialist" and "specialties" as used in MCL 600.2169(1) are defined as the specialties recognized by the American Board of Medical Specialties (ABMS), the American Osteopathic Association (AOA), the American Board of Physician Specialties (ABPS), or other similar nationally recognized umbrella-based physician certifying entities. Further, we hold that the "matching" requirement under MCL 600.2169 follows the listed general board certifications, which are the baseline "specialties" recognized by such entities for certification purposes. The statute does not require matching of *sub*specialties. We also emphasize that a trial court must ensure that experts with matching specialties under MCL 600.2169(1) meet other criteria set forth in MCL 600.2169(2) and that MCL 600.2169(3) provides trial courts with broad discretion in assessing experts.

2

I.  LEGAL BACKGROUND: *WOODARD*'S INTERPRETATION OF MCL 600.2169

In a medical malpractice action, the plaintiff "bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard of care by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Wischmeyer v Schanz*, 449 Mich 469, 484; 536 NW2d 760 (1995).  The failure to establish any one of these elements is fatal to a plaintiff's medical malpractice action.  *Id*.  The standard of care is controlled by how other physicians in a field of medicine[1] would act when providing the same treatment.  *Cudnik v William Beaumont Hosp*, 207 Mich App 378, 382; 525 NW2d 891 (1994).

Expert testimony is required to establish the applicable standard of care and a breach of that standard.  *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016).  MCL 600.2912d(1) mandates that the plaintiff in a medical malpractice action "file with the complaint an affidavit of merit signed by a health professional who the plaintiff's attorney reasonably believes meets the requirements for an expert witness under MCL 600.2169." With regard to expert witness requirements, MCL 600.2169 states, in pertinent part, the following:

> (1) In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the

---

[1] The standard of care for general practitioners is subject to the locality rule, which holds that the relevant standard of care is that which applies "in the community in which the defendant practices or in a similar community . . . ." MCL 600.2912a(1)(a).  On the other hand, physician specialists and experts are held to a fieldwide standard of care.  As this Court has explained, a "specialist is not measured by a local rule but by a national standard because: 'The reliance of the public upon the skills of a specialist and the wealth and sources of his knowledge are not limited to the geographic area in which he practices.' " *Francisco v Parchment Med Clinic, PC*, 407 Mich 325, 328; 285 NW2d 39 (1979), quoting *Naccarato v Grob*, 384 Mich 248, 253-254; 180 NW2d 788 (1970).

3

person is licensed as a health professional in this state or another state and meets the following criteria:

(a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in *the same specialty as the party against whom or on whose behalf the testimony is offered*. However, if the party against whom or on whose behalf the testimony is *offered is a specialist who is board certified*, the expert witness *must be a specialist who is board certified in that specialty*.

(b) Subject to subdivision (c) [which is inapplicable to these cases], during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted *a majority of* his or her professional time to *either or both* of the following:

(*i*) *The active clinical practice of the same health profession* in which the party against whom or on whose behalf the testimony is offered is licensed and, *if that party is a specialist, the active clinical practice of that specialty.*

(*ii*) *The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession* in which the party against whom or on whose behalf the testimony is offered is licensed and, *if that party is a specialist*, an accredited health professional school or accredited residency or clinical research program *in the same specialty*.

\* \* \*

(2) In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, *evaluate all of the following*:

(a) The educational and professional training of the expert witness.

(b) The *area of specialization* of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

(d) *The relevancy* of the expert witness's testimony.

4

(3) *This section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section.* [Emphasis added.]

*Woodard v Custer*, 476 Mich 545, is the seminal case that interpreted MCL 600.2169. The *Woodard* Court attempted to explain the statute's requirement that a plaintiff's proposed expert must match the "one most relevant standard of care," i.e., the specialty engaged in by the defendant physician *during the course of* the alleged malpractice. *Id*. at 560. The Court then interpreted the statute after referring to a medical dictionary definition of "specialty":

> *Dorland's Illustrated Medical Dictionary* (28th ed) defines a "specialist" as "a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice." MCL 600.2169(1)(a) requires the plaintiff's expert to specialize in the same specialty as the defendant physician, and, if the defendant physician is "a *specialist who is board certified*, the expert witness must be a specialist who is board certified in that specialty." (Emphasis added.) Both the dictionary definition of "specialist" and the plain language of § 2169(1)(a) make it clear that a physician can be a specialist who is not board certified. They also make it clear that a "specialist" is somebody who can potentially become board certified. Therefore, a "specialty" is a particular branch of medicine or surgery in which one can potentially become board certified. Accordingly, if the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery. [*Woodard*, 476 Mich at 561-562.]

Additionally, the court looked to a lay dictionary for guidance in defining "subspecialty":

> "[S]ub" is defined as "a prefix . . . with the meanings 'under,' 'below,' 'beneath' . . . 'secondary,' 'at a lower point in a hierarchy[.]' " *Random House Webster's College Dictionary* (1997). Therefore, a "subspecialty" is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty. A subspecialty, although a more particularized specialty, is nevertheless a specialty. [*Id*. at 562.]

5

*Woodard* noted that the statute makes clear "that a physician can be a specialist who is not board certified" and that "a 'specialist' is somebody who can potentially become board certified." *Id*. at 561. The Court then held, based upon the definitions it set forth, that if the defendant physician was practicing a particular branch of medicine or surgery in which one can potentially become board certified at the time of the alleged malpractice, then the plaintiff's expert must have practiced or taught the *same* particular branch of medicine or surgery for *a majority of* their time in the preceding year. *Id*. at 561-562. Furthermore, if a defendant physician specializes in a *subspecialty* and was certified in and practicing that subspecialty, the plaintiff's expert witness must be certified in the *same subspecialty* as the defendant physician. *Id*. In assessing the practice requirements of MCL 600.2169(1)(b), the Court also held:

> [O]ne cannot devote a majority of one's professional time to more than one specialty. Therefore, in order to be qualified to testify under § 2169(1)(b), the plaintiff's expert witness must have devoted a majority of his professional time during the year immediately preceding the date on which the alleged malpractice occurred to practicing or teaching the specialty that the defendant physician was practicing at the time of the alleged malpractice, i.e., the one most relevant specialty. [*Woodard*, 476 Mich at 566.]

The defendant accused of malpractice in *Woodard* was board certified in pediatrics but also had "certificates of special qualifications" in pediatric critical care medicine and neonatal-perinatal medicine. *Id*. at 554. The alleged malpractice involved care rendered to an infant in a pediatric intensive care unit. *Id*. The plaintiffs offered an expert witness who was board certified in pediatrics but who did not have the matching certificates of special qualifications. *Id*. at 555. This Court concluded that the "most relevant specialty" was pediatric critical care medicine, rendering the proposed expert unqualified to give

6

testimony because the expert lacked certification in that specialty and had not devoted a majority of their time to practicing or teaching that specialty. *Id.* at 576.[2]

In the companion case to *Woodard*—*Hamilton v Kuligowski*—the defendant physician was a specialist in internal medicine and was practicing internal medicine when the alleged malpractice occurred. *Id.* at 577-578. While the plaintiff's expert was also board certified in internal medicine, the Court noted that based on his training and practice, he spent the majority of his time treating infectious diseases, which is a subspecialty of internal medicine. *Id.* at 556, 578. The Court rejected the proposition that the overlap between general internal medicine and infectious disease medicine could be considered sufficient to allow the plaintiff's expert to testify as to the applicable standard of care for general internal medicine under § 2169(1). *Id.*

---

[2] Justice MARKMAN wrote the majority opinion and was joined by Justices M. F. CAVANAGH, WEAVER, and MARILYN KELLY. While he joined the majority opinion, Justice CAVANAGH also wrote a separate concurrence, reiterating the position he had previously set forth in *McDougall v Schanz*, 461 Mich 15, 38; 597 NW2d 148 (1999), which was that he believed MCL 600.2169 was unconstitutional. *Woodard*, 476 Mich at 579 (M. F. CAVANAGH, J., concurring). Chief Justice TAYLOR concurred in the result only and wrote a separate full opinion joined by Justices YOUNG and CORRIGAN, wherein he argued that if the medical malpractice at issue involved more than one most relevant specialty, multiple experts who spend the majority of their time in that specialty may, and sometimes must, also be retained. *Id.* at 617 & n 54 (opinion by TAYLOR, C.J.). Responding to assertions set forth in Chief Justice TAYLOR's opinion, Justice MARKMAN provided a summary of what he believed to be the majority holdings, among them: (a) Irrelevant specialties do not have to match; (b) only the one most relevant specialty must match; (c) an individual expert must meet all the requirements of MCL 600.2169 (experts cannot be pooled as a group to satisfy the statute); and (d) the fact that an expert is qualified under MCL 600.2169(1) does not mean the expert cannot be disqualified on other grounds. *Id.* at 586-587 (MARKMAN, J., concurring).

## II. FACTUAL BACKGROUND: *STOKES* AND *SELLIMAN*

### A. *STOKES v SWOFFORD*

In *Stokes v Swofford*, the decedent was a young woman who suffered from severe headaches due to excess fluid surrounding her brain. To relieve the fluid pressure, doctors implanted a shunt catheter.[3] Within 10 days of receiving the implant, she returned to the emergency room with headaches and vomiting, and a brain scan was performed. After reviewing her brain scan, defendant Michael J. Swofford, D.O., a diagnostic radiologist with a subspecialization in neuroradiology that expired before the alleged malpractice,[4] verified the results of the scan, and the results were relayed to emergency room physicians. The emergency room physicians attempted to relieve the decedent's brain pressure, but the procedure they used failed to help, and the decedent later died of brain swelling. The decedent's estate sued defendant and his practice on the grounds that the decedent should have been immediately referred to neurosurgery rather than exacerbating the swelling with an emergency procedure.

---

[3] According to the complaint, the type of catheter in question was a ventriculoperitoneal shunt, which is used to treat hydrocephalus by removing excess cerebrospinal fluid. National Library of Medicine, *Ventriculoperitoneal Shunt* <https://www.ncbi.nlm.nih.gov/books/NBK459351/> (accessed January 22, 2024) [https://perma.cc/WM2X-CBUB]. Untreated hydrocephalus can lead to many adverse effects including irritability, headaches, weakness in the legs, personality changes, seizures, and dementia. American Association of Neurological Surgeons, *Adult-onset Hydrocephalus* <https://www.aans.org/Patients/Neurosurgical-Conditions-and-Treatments/Adult-Onset-Hydrocephalus> (accessed January 22, 2024) [https://perma.cc/9Q87-3KAV].

[4] Dr. Swofford obtained a certificate of added qualification in neuroradiology in 2002 from the American Osteopathic Board of Radiology. This certificate is active for 10 years, which means Dr. Swofford's certification in neuroradiology would have lapsed in 2012, before the alleged malpractice in 2013.

To establish the standard of care, the estate hired a specialist in neuroradiology, Scott B. Berger, M.D., Ph.D. Neuroradiology is a subspecialty of diagnostic radiology; within both disciplines, a physician is trained in interpreting bodily images, although neuroradiologists specialize in interpreting images of the brain, spine, head, and neck. Because the malpractice involved interpreting a brain image and Dr. Swofford previously possessed a neuroradiology subspecialization, the estate moved to have the trial court expressly determine that the "one most relevant specialty" was neuroradiology rather than diagnostic radiology. The trial court denied the motion, holding that the relevant specialty was diagnostic radiology and that Dr. Swofford would be held to that standard of care, which meant that the neuroradiology subspecialist—despite also being a diagnostic radiologist—could not testify as an expert for the plaintiff.

The Court of Appeals reversed in a published opinion, applying the "one most relevant specialty" standard from *Woodard* and determining that the most relevant specialty was neuroradiology because Dr. Swofford was evaluating a scan of the decedent's brain at the time of the alleged malpractice. Because Dr. Swofford was practicing neuroradiology, the panel concluded that the plaintiff's expert Dr. Berger, a neuroradiologist, was able to testify because he was certified in that subspecialty and devoted a majority of his time to practicing neuroradiology.

B. *SELLIMAN v COLTON*

In *Selliman v Colton*, the plaintiff hired defendant Jeffrey J. Colton, M.D., to perform multiple rhinoplasties to repair his nose from previous injuries. Dr. Colton had certifications in otolaryngology, a specialty listed by the ABMS, and an additional certification from the American Board of Facial Plastic and Reconstructive Surgery

9

(ABFPRS). The plaintiff sued Dr. Colton, his business, and his place of practice for medical malpractice, alleging he had a nasal deformity due to Dr. Colton's negligence. The plaintiff proposed Dr. Michael J. Armstrong as his standard of care expert. Dr. Armstrong possessed the identical certifications as Dr. Colton. Dr. Armstrong testified that he spent roughly 10% of his time on cosmetic rhinoplasties and 90% of his time on medical rhinoplasties.

The plaintiff argued that the applicable standard of care in the malpractice action was otolaryngology. The defendants, on the other hand, argued that the procedure at issue was a cosmetic rhinoplasty, and therefore the specialty at issue was facial plastic and reconstructive surgery. The defendants argued that Dr. Armstrong's deposition testimony showed that he did not devote a majority of his professional time to the active clinical practice or instruction of facial plastic and reconstructive surgery and that he thus failed to meet the requirements of MCL 600.2169(1). The trial court denied the motion to strike Dr. Armstrong without prejudice, noting that the record conflicted as to how to assign percentages to the time Dr. Armstrong spent on functional versus cosmetic procedures.[5]

In an unpublished per curiam opinion, the Court of Appeals reversed, holding that the trial court abused its discretion by denying the motion to strike the testimony of Dr. Armstrong. Applying *Woodard*, the Court of Appeals determined that Dr. Colton was

---

[5] The trial court found the testimony confusing and ambiguous, noting that "it is unclear whether Doctor Armstrong's testimony reflects that 90 percent of his practice was devoted to [otolaryngology], and 10 percent to facial, plastic, and reconstructive surgery or whether within his facial, plastic, and reconstructive practice, 10 percent of his procedures may be for cosmetic purposes with 90 percent being more functional" and that given "seemingly contradictory statements . . . made regarding Doctor Armstrong's practice, the Court cannot determine at this time whether Doctor Armstrong is qualified or not pursuant to [MCL] 600.2169(1)(B)."

10

practicing facial plastic and reconstructive surgery at the time of the alleged malpractice. Despite the trial court's note that the testimony of Dr. Armstrong was unclear as to the time spent on his various specialties, the Court of Appeals concluded that Dr. Armstrong had unequivocally testified that 10% of his practice involved facial plastic and reconstructive surgery procedures and 90% involved otolaryngology procedures. Since the most relevant specialty in the malpractice action was facial plastic reconstructive surgery, the Court of Appeals held that Dr. Armstrong could not testify because he spent a majority of his professional time practicing otolaryngology—not facial plastic and reconstructive surgery.

## III. STANDARD OF REVIEW

These cases involve the interpretation of MCL 600.2169(1), which sets forth the requirements for expert medical witnesses in medical malpractice lawsuits. Questions of statutory interpretation are reviewed de novo. *Coblentz v Novi*, 475 Mich 558, 561; 719 NW2d 73 (2006). We review a trial court's rulings concerning the qualifications of proposed expert witnesses to testify for an abuse of discretion. *Cox v Flint Bd of Hosp Managers*, 467 Mich 1, 16 n 16, 651 NW2d 356 (2002). An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes. *Novi v Robert Adell Children's Funded Trust*, 473 Mich 242, 254; 701 NW2d 144 (2005).

## IV. THE PROBLEMS WITH *WOODARD*

While *Woodard* attempted to clarify the medical expert standard as outlined in MCL 600.2169, its rulings actually muddied the waters. *Woodard* erred in two significant ways. First, it ignored the plain language of MCL 600.2169(1) by conflating the terms "specialty" and "*sub*specialty," effectively reading additional text into the statute. And second,

11

*Woodard* failed to analyze MCL 600.2169 in its entirety, focusing only on Subsection (1) but neglecting the "checks and balances" effect of Subsections (2) and (3).[6]

## A. THE PLAIN LANGUAGE OF MCL 600.2169 DOES NOT CONSIDER "SUBSPECIALTIES"

One of the primary flaws in *Woodard* is equating the term "specialty" with "subspecialty." "[T]he plain and unambiguous language of a statute must be applied as written." *Nowell v Titan Ins Co*, 466 Mich 478, 482; 648 NW2d 157 (2002). Nowhere in the language of MCL 600.2169 is there a reference to "subspecialties." MCL 600.2169(1)(a) says that if the defendant physician is a specialist, then the expert must practice or teach in the "same *specialty*." (Emphasis added.) Similarly, the statute states that if the defendant physician "is a *specialist* who is board certified, the expert witness must be a specialist who is board certified in that *specialty*." *Id*. (emphasis added).

Prior to *Woodard*, the Court of Appeals recognized that the statute did not require an exact matching of subspecialties, stating, "[W]e presume that the Legislature was familiar with the term 'sub-specialty' when it enacted the provision, and the Legislature chose to use 'specialty,' not 'sub-specialty.' " *Watts v Canady*, 253 Mich App 468, 470; 655 NW2d 784 (2002). The Legislature, in fact, has demonstrated this understanding by

---

[6] We note that *Woodard* may have erred in a third way by concluding that a physician can only devote a "majority" of their time at a given time to one specialty or subspecialty under MCL 600.2169(1)(b). While MCL 600.2169(1)(b) requires that a medical malpractice expert devote a "majority of his or her professional time" via clinical time or instruction to the same specialty as the defendant practitioner, *Woodard*'s construction of the practice requirement necessitates that physicians compartmentalize their professional time into readily distinguishable slots. But MCL 600.2169(1)(b) contains no prohibition on a professional doing two things at the same time; and *Woodard* completely ignored the obvious overlap between specialties and subspecialties. We, however, do not reach this question, given our holding addressing *Woodard*'s conflation of the terms "specialty" and "subspecialty" and its negation of MCL 600.2169(2) and (3).

12

using the term "subspecialty" in MCL 333.17001(1)(a)(*ii*)(A),[7] a part of the Public Health Code, but not in MCL 600.2169(1).[8]

Accordingly, this Court should recognize that "specialties" and "subspecialties" are linguistically distinctive and separate terms, and the addition of a prefix changes the meaning of the original term. As *Woodard* recognized and we acknowledge, these are technical terms within the practice of medicine that require a technical definition. A medical specialty refers to "[t]he particular subject area or branch of medical science to

---

[7] MCL 333.17001 provides definitions regarding the practice of medicine under Part 170 of Michigan's Public Health Code and states that the following is an "academic institution":

> A hospital licensed under article 17 [of the Public Health Code, MCL 333.20101 *et seq*.] that meets all of the following requirements:
>
> (A) . . . at least 1 of the residency programs is in the specialty area of medical practice, or in a specialty area that includes the *subspecialty* of medical practice, in which the applicant for a limited license proposes to practice or in which the applicant for a full license has practiced for the hospital. [MCL 333.17001(1)(a)(*ii*)(A) (emphasis added).]

[8] The terms "specialty" and "subspecialty" first appeared in the 1990 version of MCL 333.17001(1)(a)(*ii*)(A). Cf. 1978 PA 368; 1990 PA 247 and 248. These terms were added as part of the description of residency programs for medical practice in connection with the definition of an "academic institution." This is the language that remains in MCL 333.17001(1)(a)(*ii*)(A) today. Thus, by the time the Legislature amended MCL 600.2169 to its current form in 1993, see 1993 PA 78, the Legislature was aware that there was a technical difference in the medical profession between a "specialty" and a "subspecialty" because the Legislature had acknowledged this difference when it made comprehensive updates to the Public Health Code via 1990 PA 247 and 1990 PA 248. And while the dissent is correct that this point is not dispositive given that the Public Health Code is unrelated to the provisions of the Revised Judicature Act at issue in this case, we simply note that the Public Health Code definitions demonstrate that the two words are different and that the Legislature understands how to use them.

which one devotes professional attention."[9]  And *Woodard* aptly defined "specialist" as " 'a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice.' "  *Id*. at 561, quoting *Dorland's Illustrated Medical Dictionary* (28th ed).  The Court then noted that "MCL 600.2169(1)(a) requires the plaintiff's expert to specialize in the same specialty as the defendant physician, and, if the defendant physician is 'a *specialist who is board certified*,' the expert witness must be a specialist who is board certified in that specialty."  *Id*.  The Court concluded that both the dictionary definitions and the statute provide that a physician can be a specialist who is not board certified—and that "a 'specialist' is somebody who can potentially become board certified."  The Court then held:

> Therefore, a "specialty" is a particular branch of medicine or surgery in which one can potentially become board certified.  Accordingly, if the defendant physician practices a particular branch of medicine or surgery in which one can potentially become board certified, the plaintiff's expert must practice or teach the same particular branch of medicine or surgery. [*Woodard*, 476 Mich at 561-562.]

While we agree with the definition of "specialty" and *Woodard*'s summary of MCL 600.2169's text, we disagree that a subspecialty, as that word is defined, is the same thing as a specialty.  A medical subspecialty is a concentrated area of knowledge and skills existing "within a specialty" requiring additional training and education.[10]  While MCL

---

[9] The Free Dictionary, Medical Dictionary, specialty <https://medical-dictionary.thefreedictionary.com/specialty> (accessed January 23, 2024) [https://perma.cc/N9VS-P2C9].

[10] The Free Dictionary, Medical Dictionary, subspecialty <https://medical-dictionary.thefreedictionary.com/subspecialty> (accessed January 23, 2024)

14

600.2169 lacks a specific definition for the term "specialty," the term is also used in several other statutes related to the medical profession and, in those contexts, is specifically tied to "board certification."[11]

Under MCL 333.2701(a), a provision of the Public Health Code related to recruitment of healthcare providers, "board certified" means "certified to practice in a *particular medical specialty* by a national board recognized by the *American Board of Medical Specialties* or *the American Osteopathic Association*." (Emphasis added.) Similarly, the Insurance Code defines "board certified" in nearly the same way when discussing the legal requirements for insurance contracts:

> As used in this section, "board certified" means certified to practice in a particular medical or other health professional specialty by the [ABMS], the American Osteopathic Association Bureau of Osteopathic Specialists, or another appropriate national health professional organization. [MCL 500.2212a(7).]

And the Nonprofit Health Care Corporation Reform Act employs almost the same definition as the Insurance Code:

> As used in this section, "board certified" means certified to practice in a particular medical or other health profession specialty by the [ABMS] or other national health professional organization. [MCL 550.1402a(4).]

In defining "board certified," these statutes reveal the Legislature's consistent deference to certifications offered by the ABMS and the AOA. This is unsurprising,

---

[https://perma.cc/E2N5-9AF4]. *Dorland's Illustrated Medical Dictionary* (32d ed) similarly defines "subspecialty" as "a branch of medicine subordinate to a specialty, as gastroenterology is a subspecialty of internal medicine."

[11] We agree with *Woodard* that MCL 600.2169 covers both noncertified specialists and board certified specialists.

considering the status of the ABMS and the AOA within the medical profession as the leading medical board-certifying entities since the early 1900s.[12] Additionally, the ABPS is another nationally recognized board-certifying entity commonly cited for its expertise in the United States.[13]

While the ABMS, the AOA, and the ABPS are the leading and most well-accepted sources of board certifications for physicians in the United States, we note that there are several other general and niche board certifications offered to physicians through organizations that are not affiliated with one of these three entities. These too may be defined as specialties or subspecialties depending upon the requirements for those certifications, such as whether an umbrella certification is a prerequisite to obtaining a

---

[12] See ABMS, *Our Story* <https://www.abms.org/about-abms/our-story/> (accessed July 1, 2024) [https://perma.cc/47EL-YQBF] (explaining that the first concept of a medical specialty board came into being in 1908 and that the ABMS was founded in 1933, with the general qualifications and educational requirements for certifications first being outlined in 1934); Gevitz, *"The "Doctor of Osteopathy": Expanding the Scope of Practice*, 114 J Am Osteopathic Ass'n 200, 200-212 (2014) (explaining that the modern AOA originated in 1901, with goals that included heightening educational standards, creation of a code of ethics, and aiding legislative efforts to secure osteopathic licensure).

[13] See ABPS, *Facts About the American Board of Physician Specialties (ABPS)* <https://www.abpsus.org/abpsfactshheet/> (accessed July 2, 2024) [https://perma.cc/ZZM2-MY5Y] (explaining that the ABPS, which was formed in 1952, serves as the certifying body of the American Association of Physician Specialists and noting that its certifications are now recognized by the Centers for Medicare and Medicaid Services, the Veterans' Health Administration and the United States Armed Forces under the GI Bill, and numerous state medical boards); Department of Health and Human Services, Centers for Medicare & Medicaid Services, *Medicaid Program; Payments for Services Furnished by Certain Primary Care Physicians and Charges for Vaccine Administration Under the Vaccines for Children Program*, 77 Fed Reg 66670, 66673, 66675, 66691 (November 6, 2012) (explaining that 42 CFR 447.400 was being updated to recognize board certifications from the AOA and the ABPS, in addition to the previously recognized ABMS).

narrower niche certification. As in *Woodard*, we do not confine the definition of "board certified" to specific professional medical entities.[14] These certifications may also qualify as "specialties" or subspecialties depending upon the requirements for obtaining those certifications, such as whether board certification for a general specialty is a prerequisite to obtaining a more focused certification. The "matching" required by MCL 600.2169(1) is limited to general board specialties and does not require precise matching of subspecialties. In sum, *Woodard*'s construction of the "matching" requirement was flawed because the Legislature used the word "specialty"—not "subspecialty"—when it drafted MCL 600.2169(1), and *Woodard* changed the meaning of the statute by reading in "subspecialty."

---

[14] Rather than tie the requirements of MCL 600.2169(1) to a specific professional board, *Woodard* defined "board certified" as a "certification from an official group of persons who direct or supervise the practice of medicine that provides evidence of one's medical qualifications." *Woodard*, 476 Mich at 564. We take no issue with this definition of "board certified" but simply disagree that a "board certification" that requires prerequisites set forth by a more general umbrella certification applies in the same way to both a "specialty" and "subspecialty." While we recognize that the American Medical Association filed an amicus brief supporting *Woodard*'s interpretation of MCL 600.2169, we believe this interpretation fails to recognize that a subspecialty is different from a specialty. While both may require "board certifications" from a professional organization, a certification that requires as a prerequisite the possession of another more *general* board certification (a "specialty") from an umbrella-certifying entity before seeking further certification is a *sub*specialty for purposes of MCL 600.2169.

17

## B. LACK OF ANALYSIS OF TRIAL COURT DISCRETION UNDER MCL 600.2169(2) AND (3)

A primary rationale of the Legislature in adopting MCL 600.2169(1) was to ensure that experts in medical malpractice actions are not underqualified.[15] This is an understandable goal. Physicians practicing internal medicine provide the quintessential example of this concern. Internal medicine is recognized as a specialty by the ABMS, and it has more than 20 subspecialties that often have little to do with one another.[16] For

---

[15] The legislative history of MCL 600.2169 reveals that the statute was designed to combat a rising problem in retaining experts in medical malpractice cases, as explained by Michigan's Senate Select Committee on Civil Justice Reform:

> As a practical matter, in many courts merely a license to practice medicine is needed to become a medical expert on an issue.
>
> This has given rise to a group of national professional witnesses who travel the country routinely testifying for plaintiffs in malpractice actions. These "hired guns" advertise extensively in professional journals and compete fiercely with each other for the expert witness business. For many, testifying is a full-time occupation and they rarely actually engage in the practice of medicine. . . .
>
> This proposal is designed to make sure that expert witnesses actually practice or teach medicine. . . . In particular, with the malpractice crisis facing high-risk specialists, such as neurosurgeons, orthopedic surgeons and ob/gyns, this reform is necessary to insure that in malpractice suits against specialists the expert witnesses actually practice in that same specialty. This will protect the integrity of our judicial system by requiring real experts instead of "hired guns." [Report of the Senate Select Committee on Civil Justice Reform, presented September 26, 1985, pp 28-29.]

[16] See ABMS, *American Board of Internal Medicine* <https://www.abms.org/board/american-board-of-internal-medicine/> (accessed January 23, 2024) [https://perma.cc/UT48-38VX].

instance, a pulmonologist[17] and a cardiologist[18] are both subspecialists under the specialty of internal medicine. Concerns have been raised that doing away with consideration of subspecialties for purposes of the *matching* requirement would mean that a pulmonologist would then be qualified to testify against a cardiologist since both share the same *specialty*. However, this argument ignores MCL 600.2169(2) and (3). Even if expert specialties "match" under MCL 600.2169(1), the trial court still has discretion on whether to accept the expert as qualified to provide testimony in a particular case. MCL 600.2169(2) *mandates* that the trial court evaluate *all* the following factors:

(a) The educational and professional training of the expert witness.

(b) The area of specialization of the expert witness.

(c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

(d) The *relevancy* of the expert witness's testimony. [Emphasis added.]

Taking the above scenario as an example, and assuming the alleged malpractice stemmed from a cardiac issue,[19] the trial court would easily exclude a pulmonologist's

---

[17] A pulmonologist is an internal medicine physician who specializes in the respiratory system. American Lung Association, *Know Your Providers: What Does a Pulmonologist Do?* <https://www.lung.org/blog/know-your-providers-pulmonologist> (accessed January 23, 2024) [https://perma.cc/K5CS-DXSK].

[18] A cardiologist is an internal medicine physician who specializes in the heart. Cleveland Clinic, *Cardiologist* <https://my.clevelandclinic.org/health/articles/21983-cardiologist> (accessed January 23, 2024) [https://perma.cc/WW2L-BFFM].

[19] If the relevant standard of care for the alleged malpractice was something more generally related to internal medicine—for instance, a basic function of care that does not hinge on cardiac expertise—then perhaps a pulmonologist might be qualified to testify under MCL

testimony because the relevancy of that testimony would prove futile to ascertaining the cardiologist's performance. Moreover, a trial court could go further under MCL 600.2169(3), which provides, "This section does not limit the power of the trial court to disqualify an expert witness on grounds *other than* the qualifications set forth in this section." (Emphasis added.) This provision allows disqualifications by the trial court for other reasons, meaning an internist who exclusively treats medical conditions associated with the lungs could be deemed unqualified to testify as an expert for an internist who exclusively treats medical conditions associated with the heart if the alleged malpractice involved an alleged error that is specific to the heart.

While the Legislature adopted MCL 600.2169 to ensure that medical experts would not be underqualified, *Woodard*'s mistaken interpretation as to subspecialties effectively excludes highly qualified medical providers from serving as experts. It further ignores that a trial court must ensure that experts with matching specialties meet other criteria set forth in MCL 600.2169(2) and that MCL 600.2169(3) provides trial courts with broad discretion in assessing experts. Both sections, which were effectively nullified after *Woodard* since highly competent experts often could not get past 600.2169(1), provide assurances that experts must be qualified for the case before the trial court.[20]

600.2169(1) despite lacking knowledge specific to cardiology. Such an expert would of course need to be qualified under MCL 600.2169(2) and (3) per the court's discretion.

[20] The dissent notes that *Woodard* did not negate MCL 600.2169(2) and (3) because those sections, as pointed out by Justice MARKMAN in his concurrence, could still be used to disqualify an expert who did not have experience in other relevant areas where the malpractice was alleged. Justice MARKMAN offered this in response to Chief Justice TAYLOR's opinion, which claimed that an expert was needed to match every practice area where malpractice may have occurred—an assertion the *Woodard* majority disagreed with, holding that only the *one* most relevant specialty at issue has to match according to the

## V.  PRINCIPLES OF STARE DECISIS FAVOR PARTIALLY OVERTURNING *WOODARD*

Stare decisis ensures "uniformity, certainty, and stability in the law . . . ." *Parker v Port Huron Hosp*, 361 Mich 1, 10; 105 NW2d 1 (1960).  However, our precedents can be revisited if wrongly decided.  *Robinson v Detroit*, 462 Mich 439, 464; 613 NW2d 307 (2000).  A decision is wrongly decided if it misunderstood or misconstrued a plainly worded statute or if it "has fallen victim to a subsequent change in the law."  *Id*.  We conclude that *Woodard* was in part wrongly decided, so the next step is to determine whether that precedent should be overruled.  *Robinson* invokes a three-part test to examine the effects of overruling a previous incorrect judicial decision: (1) whether the questioned decision "defies 'practical workability,' " (2) "whether reliance interests would work an undue hardship" if the decision were overturned, and (3) "whether changes in the law or facts no longer justify" the decision.  *Id*. at 464.

We hold that *Woodard* satisfies the standards outlined in *Robinson*.  First, *Woodard* defies practical workability.  The application of its standard has led to inconsistent and

---

statutory language.  We agree with the *Woodard* majority that only the one most relevant specialty must match, and we agree with Justice MARKMAN that Subsections (2) and (3) of MCL 600.2169 could be used to disqualify an expert if other areas of malpractice are relevant.  But we note that we have been unable to locate any appellate decision decided under either MCL 600.2169(2) or (3) post-*Woodard*.  One case, *Gonzalez v St John Hosp & Med Ctr (On Reconsideration)*, 275 Mich App 290, 308; 739 NW2d 392, 401-402 (2007), was remanded to the trial court to determine whether the challenged expert was qualified "pursuant to MRE 702 *while engaging in the analysis set forth in MCL 600.2169(2)*[.]" (Emphasis added.)  This is the sole post-*Woodard* appellate decision we have located where MCL 600.2169(2) or (3) had potential dispositive use.  This strongly suggests that *Woodard* rendered MCL 600.2169(2) and (3) effectively nugatory under most circumstances.

21

untenable results in subsequent cases.[21]  The facts and procedural history of *Stokes* and

*Selliman* prove the point.  In *Stokes*, the trial court adopted *Woodard*'s interpretation of

MCL 600.2169(1) to conclude that an expert diagnostic radiologist could not testify as to

the standard of care regarding diagnostic radiology because he subspecialized in

neuroradiology; in other words, an expert holding the *same specialty* as the defendant

physician could not give expert testimony as to the standard of care.  In essence, the expert

in *Stokes* was considered overqualified by the trial court.  The Court of Appeals, in applying

*Woodard*, reversed the *Stokes* trial court and held that the "one most relevant specialty"

was neuroradiology, a *sub*specialty of diagnostic radiology.

With respect to *Selliman*, the trial court struggled to assign just one specialty (or

subspecialty) to the defendant physician's practice when performing a rhinoplasty to

correct prior injuries to plaintiff's nose.  The Court of Appeals reversed, drawing a hard

---

[21] See, e.g., *Klett v Chavali*, unpublished per curiam opinion of the Court of Appeals, issued December 17, 2020 (Docket No. 350382) (affirming the trial court's exclusion of expert testimony by the defendant physician because even though the defendant physician held a board certification in internal medicine, he did not spend the majority of his time practicing or teaching that specialty); *Johnson v Bhimani*, unpublished per curiam opinion of the Court of Appeals, issued February 10, 2011 (Docket No. 292327) (affirming the trial court's ruling that the plaintiff's expert was not qualified to testify against a diagnostic radiologist because, although a diagnostic radiologist himself, the expert spent the majority of his time practicing the subspecialty of neuroradiology); *Jilek v Stockson*, 289 Mich App 291; 796 NW2d 267 (2010) (holding that the trial court erred by allowing the plaintiff's expert to testify where the expert specialized in emergency medicine, the defendant was an internist who was board certified in family medicine but was practicing emergency medicine at the time of the alleged malpractice, and the trial court had not yet determined the specialty most relevant to the standard of care), rev'd 490 Mich 961 (2011); *In re Roberdeaux Estate*, unpublished per curiam opinion of the Court of Appeals, issued October 18, 2016 (Docket No. 323802) (concluding that the defendant's expert was qualified to testify where the defendant was board certified in internal medicine and the expert was certified in both internal medicine and geriatrics, a subspecialty of the former).

line dividing the specialties completely. Both *Stokes* and *Selliman* demonstrate how difficult it is to apply *Woodard* in practice.

Second, reliance interests do not favor retention of *Woodard*'s interpretation of MCL 600.2169. In assessing reliance interests, "the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Robinson*, 462 Mich at 466. While it is true that both defendants and plaintiffs in medical malpractice actions have a justified interest in ensuring that expert testimony appropriately fits the standard of care, such an interest is not protected by the ruling in *Woodard*, but by the statute itself. As this Court underscored in *Robinson*:

> [W]hen dealing with an area of the law that is statutory, . . . it is to the words of the statute itself that a citizen first looks for guidance in directing his actions. . . . Thus, if the words of the statute are clear, the actor should be able to expect, that is, rely, that they will be carried out by all in society, including the courts. *In fact, should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest.* When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court's misconstruction. The reason for this is that the court in distorting the statute was engaged in a form of judicial usurpation that runs counter to the bedrock principle of American constitutionalism, i.e., that the lawmaking power is reposed in the people as reflected in the work of the Legislature, and, absent a constitutional violation, the courts have no legitimacy in overruling or nullifying the people's representatives. [*Id*. at 467 (emphasis added).]

In short, overruling *Woodard* would not rob litigants of their protected interests in securing appropriate experts, for the right itself is statutorily guaranteed. *Woodard* departed from the plain meaning of MCL 600.2169, the details of which have been discussed in the previous section. In so doing, it is the *Woodard* decision that jeopardized

23

litigants' reliance interests on the statutory language, and we believe it is the duty of this Court to restore those reliance interests by overruling that flawed decision.

As an additional matter, the only parties relying on *Woodard* are litigants when selecting their expert witnesses, as physicians do not intend to commit malpractice and thus do not *rely* on *Woodard* in a practical sense. But even litigants are not burdened when the criteria for selecting an expert are modified. Litigants will need to adjust to the new rules as they file lawsuits. However, this Court does not recognize the need to alter litigation strategy as a sufficient reliance interest preventing the overruling of precedent. In *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 760; 641 NW2d 567 (2002), the Court dismissed the notion that a reliance interest emerged merely because lawyers would need to relearn the law if precedent was overruled:

> [T]he dissent offers the novel argument that a "reliance" interest has arisen here . . . *because lawyers will have to relearn the law*. That, of course, *would be true of any overruling of precedent, but this has never before been viewed as raising a "reliance" interest* sufficient to preclude a plainly flawed reading of the law from being corrected. Further, we are confident that it will not take long for the legal profession in our state to comprehend an interpretation of § 301(2) in which its words mean what they say. [Emphasis added.]

Similarly, here, there is no reliance interest when litigants need to adjust their litigation strategy. Such a circumstance would apply to any overruling of precedent and is not a compelling reason to prevent a flawed interpretation of the law from being corrected. There is no reason to doubt that Michigan lawyers are well-equipped to modify their expert selections in line with an accurate interpretation of MCL 600.2169 should this aspect of *Woodard* be overruled.

The final factor is whether the law or relevant facts have changed such that the prior decision can no longer stand. While there has not been a significant change to the language of MCL 600.2169 and no party has informed us of a material change in fact, we conclude that the totality of the remaining factors weigh in favor of overruling *Woodard* in part, because the aforementioned reasons showcase the instability of the decision and its lack of justification moving forward.

## VI.  APPLICATION TO *STOKES v SWOFFORD*

In light of the foregoing, the one most relevant specialty in *Stokes* was diagnostic radiology because it was the only *specialty* that defendant held and practiced. "Diagnostic radiology" is the only ABMS "specialty" at issue in *Stokes*. Therefore, the proposed expert would need to be a specialist in diagnostic radiology, which he was. Dr. Berger, plaintiff's proposed expert, practices diagnostic radiology whenever he reads a neuroimaging scan. In short, Dr. Berger spends 100% of his time practicing the "one relevant specialty"— diagnostic radiology—and thus he satisfies the requirements under MCL 600.2169(1) to testify as an expert in the case against Dr. Swofford.

While the Court of Appeals reached the right result in deeming Dr. Berger fit to testify, it did so for the wrong reason. The Court of Appeals, in applying the faulty *Woodard* standard, erred by concluding that the relevant specialty was neuroradiology and that Dr. Berger was therefore qualified because he spent a majority of his time as a neuroradiologist. Instead, he was qualified because his subspecialty of neuroradiology was subsumed within the broader specialty of diagnostic radiology.

25

## VII. APPLICATION TO *SELLIMAN v COLTON*

With regard to *Selliman*, the Court of Appeals reached an irreconcilable result when it decided to exclude Dr. Armstrong as an expert on the sole basis of Dr. Armstrong's testimony as to the reason he performed his surgeries. The defendant physician and the plaintiff's proposed expert were identically board certified in otolaryngology and facial plastic and reconstructive surgery. Yet, because the defendant categorized the procedure as "cosmetic" and not "functional," the Court of Appeals deemed Dr. Armstrong unqualified to testify pursuant to *Woodard*. The Court of Appeals found that Dr. Armstrong unequivocally testified that 10% of his practice involved facial plastic and reconstructive surgery procedures and 90% involved otolaryngology procedures. The Court of Appeals concluded that the most relevant specialty in the malpractice action was facial plastic reconstructive surgery and thus held that Dr. Armstrong could not testify because he spent a majority of his professional time practicing otolaryngology and not facial reconstructive surgery. Facial plastic and reconstructive surgery is a certification available to physicians once they obtain a board certification in either otolaryngology or plastic surgery, seemingly operating like a "subspecialty."[22] Whether facial plastic and reconstructive surgery is a subspecialty rather than a specialty is a fact-intensive inquiry

---

[22] There are many certification entities for physicians. Some (such as the ABMS, the AOA, and the ABPS) are umbrella organizations that provide certifications for a wide variety of specialties and subspecialties. Other entities (such as the ABFPRS) require that a physician have a specialty prior to being eligible for further niche certification. While an additional certification beyond the general specialty or subspecialty categories set forth by the ABMS, the AOA, or the ABPS could be offered by another certifying entity, the additional certification is a subspecialty for purposes of MCL 600.2169(1) if a prior specialty certification from another umbrella-based certifying entity like the ABMS, the AOA, or the ABPS is required to obtain the additional certification.

best reserved for the trial court, with the option of an evidentiary hearing as needed, to consider factors that would be relevant to the medical community in making this determination.[23] Accordingly, we remand *Selliman* to the trial court to determine this issue in a manner consistent with this opinion.

## VIII. CONCLUSION

We conclude that *Woodard* was in part wrongly decided and must be overruled in part. *Woodard* provided a skewed and inaccurate construction of MCL 600.2169, which has resulted in highly qualified experts being disqualified. *Woodard* incorrectly conflated the terms "specialty" and "subspecialty" in a manner that was inconsistent with and changed the meaning of the plain language of the statute, and it failed to highlight the significant discretion provided to trial courts under MCL 600.2169(2) and (3) to exclude experts even when such experts qualify under Subsection (1). We hold that that the words "specialist" and "specialties" as used in MCL 600.2169(1) are defined as the specialties recognized by the ABMS, AOA, ABPS, or other nationally recognized physician umbrella-certifying organizations. Further, we hold that the "matching" requirement under MCL 600.2169 is limited to the relevant board certification specialty and does not require matching of subspecialties. And we reiterate that a trial court must ensure that experts with

---

[23] It is impossible to exhaustively list every fact or factor that might be relevant to the specialty-subspecialty distinction, nor can we predict everything that the medical community would deem relevant. At a minimum, courts should consider whether an umbrella specialty certification is required as a prerequisite to obtaining the certification at issue, as discussed in note 22 of this opinion. Additional factors that might be relevant include, but are not limited to, the requirements for the certification in question, the nature and rigor of the certification process and any required assessments, and the overlap (if any) in the areas of the practice of medicine that are at issue.

matching specialties under MCL 600.2169(1) must also satisfy MCL 600.2169(2) and that MCL 600.2169(3) provides trial courts with broad discretion in assessing experts.

While the Court of Appeals reached the correct result in *Swofford*, it relied on *Woodard*. Thus, it erred by concluding that the relevant specialty was neuroradiology and that Dr. Berger was therefore qualified because he spent a majority of his time as a neuroradiologist. Instead, Dr. Berger was qualified because the relevant specialty was diagnostic radiology and his subspecialty of neuroradiology was subsumed within that broader specialty. We therefore affirm in part and reverse in part the judgment of the Court of Appeals, and we remand to the trial court for proceedings consistent with this opinion.

As to *Selliman*, the Court of Appeals held that Dr. Armstrong was not qualified to give standard of care testimony under MCL 600.2169. But it relied on *Woodard* when assessing the time spent by defendant and Dr. Armstrong on both otolaryngology and facial plastic and reconstructive surgery—treating both as specialties. Therefore, we reverse the judgment of the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

We do not retain jurisdiction.

> Elizabeth M. Welch
> Richard H. Bernstein
> Megan K. Cavanagh
> Kyra H. Bolden

28

STATE OF MICHIGAN

SUPREME COURT

JOELYNN T. STOKES, Personal
Representative of the ESTATE OF LINDA
HORN,

        Plaintiff-Appellee,

v                                   No. 162302

MICHAEL J. SWOFFORD, D.O., and
SOUTHFIELD RADIOLOGY ASSOCIATES,
PLLC,

        Defendants-Appellants.

_____

ANTONIO SELLIMAN,

        Plaintiff-Appellant,

v                                   No. 163226

JEFFREY J. COLTON, M.D., JEFFREY J.
COLTON, PLLC, and COLTON
CENTER,

        Defendants-Appellees.

_____

CLEMENT, C.J. (*dissenting*).

      The majority overrules *Woodard v Custer*, 476 Mich 545; 719 NW2d 842 (2006),

in part, concluding that *Woodard* erred in its interpretation of MCL 600.2169(1).

Specifically, the majority contends that *Woodard* erred by defining "specialty" as including

"subspecialty" and by preventing trial courts from exercising the discretion allotted to them

under MCL 600.2169(2) and (3). I disagree with these conclusions. Moreover, I believe that under the doctrine of stare decisis, *Woodard* should be retained. Due to these disagreements with the majority, I dissent. I would affirm the Court of Appeals in both of the instant cases and leave *Woodard* intact.

## I. LEGAL BACKGROUND

MCL 600.2169(1) sets out the requirements for a medical expert testifying as to the standard of care in a medical malpractice action. The provision states:

> In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:
>
> (a) If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action *in the same specialty* as the party against whom or on whose behalf the testimony is offered. However, if the party against whom or on whose behalf the testimony is offered is a specialist who is board certified, the expert witness must be a specialist who is board certified in that specialty.
>
> (b) Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted *a majority* of his or her professional time to either or both of the following:
>
> (*i*) The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.
>
> (*ii*) The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, an accredited health professional school or accredited residency or clinical research program in the same specialty. [Emphasis added.]

2

*Woodard*, 476 Mich at 545, is the primary case interpreting this provision. *Woodard* held that a plaintiff's expert "must match the one most relevant standard of practice," which is "the specialty engaged in by the defendant physician during the course of the alleged malpractice, and, if the defendant physician is board certified in that specialty, the plaintiff's expert must also be board certified in that specialty." *Id*. at 560.

Relevant to the instant case, regarding the definition of "specialty," *Woodard* concluded that though § 2169 references only a "specialty," "specialty" should be read to include a "subspecialty." In brief, *Woodard* reasoned: "A subspecialty, although a more particularized specialty, is nevertheless a specialty. Therefore, if a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action." *Id*. at 562.

On a separate note, though *Woodard* focused primarily on the interpretation of § 2169(1), it observed that "even when a proffered expert meets the criteria contained in § 2169(1), the expert is subject to further scrutiny under § 2169(2) [and] § 2169(3) . . . ." *Id*. at 574. These are the aspects of *Woodard* with which the majority now takes issue.

## II. FACTS

I agree with the majority's recounting of the facts. In short, in *Stokes v Swofford*, the Court of Appeals held that plaintiff's expert satisfied the requirements of MCL 600.2169(1). Plaintiff alleged that defendant had committed malpractice by misreading the computed tomography (CT) scan of her skull. The defendant doctor was a specialist in diagnostic radiology with a subspecialization in neuroradiology, though his certificate of

3

added qualification (CAQ) in neuroradiology had lapsed at the time of the alleged malpractice. Plaintiff's expert practiced the subspecialty of neuroradiology. The Court of Appeals determined that defendant was practicing neuroradiology at the time of the alleged malpractice by reading the CT scan of plaintiff's skull and that neuroradiology was the most relevant specialty.[1] Therefore, because neuroradiology was the one most relevant specialty and plaintiff's expert spent a majority of his time practicing that subspecialty, the expert was qualified to testify.[2]

In *Selliman v Colton*, the Court of Appeals held that plaintiff's expert did not satisfy the requirements of § 2169(1). The procedure during which the alleged malpractice occurred was a rhinoplasty done for cosmetic reasons. Physicians may perform rhinoplasties either for cosmetic reasons while practicing facial plastic and reconstructive surgery, or for functional reasons while practicing otolaryngology. Because the rhinoplasty at issue was done for cosmetic reasons, the Court of Appeals determined that the one most relevant specialty was facial plastic and reconstructive surgery.[3] Plaintiff's expert had certifications in both facial plastic and reconstructive surgery as well as otolaryngology, just as defendant doctor did. But the expert spent only 10% of his time performing rhinoplasties for cosmetic reasons, i.e., practicing facial plastic and reconstructive surgery. Therefore, the Court of Appeals held that the plaintiff's expert could not testify, as he did

---

[1] *Horn Estate v Swofford*, 334 Mich App 281, 295; 964 NW2d 904 (2020).

[2] *Id*. at 298.

[3] *Selliman v Colton*, unpublished opinion of the Court of Appeals, issued May 20, 2021 (Docket No. 352781), slip op at 6.

4

not spend the "majority of his time" in the one most relevant specialty of facial plastic and reconstructive surgery.[4]

## III. ANALYSIS

The Court of Appeals decisions in these cases were consistent with *Woodard*. But the majority today chooses to overrule *Woodard* in part, affirming on other grounds in *Stokes* and reversing in *Selliman*. In so doing, the majority relies on two criticisms of *Woodard*: first, it contends that *Woodard* erred by defining "specialty" as including "subspecialty." Second, the majority believes *Woodard* erred by not giving Subsections (2) and (3) of § 2169 sufficient effect.[5]

### A. DEFINING "SPECIALTY" VERSUS "SUBSPECIALTY"

*Woodard* turned to *Dorland's Illustrated Medical Dictionary* for the definition of "specialist," which was " 'a physician whose practice is limited to a particular branch of medicine or surgery, especially one who, by virtue of advanced training, is certified by a specialty board as being qualified to so limit his practice.' " *Woodard*, 476 Mich at 561. From that definition and the fact that MCL 600.2169(1)(a) refers to whether the defendant

---

[4] *Id*. at 5.

[5] The majority contends *Woodard* may have also erred by concluding that a physician can devote a "majority" of their time to only one specialty or subspecialty under MCL 600.2169(1)(b). *Woodard*, 476 Mich at 560. The majority argues that by requiring physicians to compartmentalize their time, *Woodard* ignored the possibility that a professional can practice in two areas at the same time and ignored the overlap between specialties and subspecialties. However, the majority does not reach the question, as it is unnecessary given their holding. I disagree with the majority's statements on this issue, as I believe that the statute itself simply does not recognize the possibility of practicing in more than one area simultaneously or, more generally, the overlap between practice areas. Any oversight lies not with *Woodard*.

doctor is "a specialist who is board certified," *Woodard* adduced that board certification is not necessary to be a specialist. *Id*. Drawing from the definition of "specialist," *Woodard* reasoned that "specialty" means "a particular branch of medicine or surgery in which one can potentially become board certified." *Id*.

Focusing on the definition of "subspecialty," *Woodard* concluded that for purposes of MCL 600.2169, a "subspecialty" should be treated like a "specialty," such that an expert must have the same subspecialty as a defendant. See MCL 600.2169(1)(a) (requiring an expert to have "the same specialty as the party against whom or on whose behalf the testimony is offered"). *Woodard* explained:

> "[S]pecialty" is defined as a particular branch of medicine or surgery in which one can potentially become board certified. Moreover, "sub" is defined as "a prefix . . . with the meanings 'under,' 'below,' 'beneath' . . . 'secondary,' 'at a lower point in a hierarchy[.]' " *Random House Webster's College Dictionary* (1997). Therefore, a "subspecialty" is a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty. A subspecialty, although a more particularized specialty, is nevertheless a specialty. Therefore, if a defendant physician specializes in a subspecialty, the plaintiff's expert witness must have specialized in the same subspecialty as the defendant physician at the time of the occurrence that is the basis for the action. [*Id*. at 562 (alterations in original).]

Thus, a subspecialty is treated just like a specialty under § 2169(1), which is to say that an expert must have the same subspecialty as the defendant doctor and must have spent the majority of their time practicing or teaching the one most relevant subspecialty in order to satisfy the conditions of the provision. Notably, *Woodard* also commented, "[N]othing in § 2169(1)(a) limits the meaning of board certificate to certificates in the 24 primary medical specialties recognized by the American Board of Medical Specialties or the 18

6

primary medical specialties recognized by the American Osteopathic Association." *Id*. at 565.

Today's majority reasons that "specialty" should be defined to exclude "subspecialty," because "specialty" and "subspecialty" are different. The Legislature could have said "subspecialty," the majority posits, as the Legislature has used that term in another statute, namely, MCL 333.17001(1)(a)(*ii*)(A). The majority approvingly cites *Woodard*'s definition of "specialty" and defines "subspecialty," similarly to *Woodard*, as existing "within a specialty."[6] But the majority adduces several examples from other statutes that tie "board certification" to a "specialty." See MCL 333.2701(a); MCL 500.2212a(7); MCL 550.1402a(4). Based on these definitions, the majority holds that "the words 'specialist' and 'specialties' as used in MCL 600.2169(1) are defined as the specialties recognized by the American Board of Medical Specialties (ABMS), the American Osteopathic Association (AOA), the American Board of Physician Specialties (ABPS), or other similar nationally recognized umbrella-based physician certifying entities."[7] Thus, only an expert's general specialty must match the relevant specialty; an expert need not match a defendant doctor's subspecialty.

1. THE LEGISLATURE NEED NOT SPECIFY "SUBSPECIALTY"

Regarding the definition of "subspecialty," the majority defines that term as "a concentrated area of knowledge and skills existing 'within a specialty' requiring additional

---

[6] *Ante* at 14 n 10, citing The Free Dictionary, Medical Dictionary, subspecialty <https://medical-dictionary.thefreedictionary.com/subspecialty> (accessed July 1, 2024) [https://perma.cc/E2N5-9AF4].

[7] *Ante* at 2.

7

training and education."[8]  Similarly, *Woodard* noted that "sub" means "'under,' 'below,' 'beneath' . . . 'secondary,' 'at a lower point in a hierarchy[.]'"  *Woodard*, 476 Mich at 562, quoting *Random House Webster's College Dictionary* (1997) (alterations in original).  Following that definition, *Woodard* concluded that a subspecialty is "a particular branch of medicine or surgery in which one can potentially become board certified that falls under a specialty or within the hierarchy of that specialty."  *Woodard*, 476 Mich at 562.  Again, *Woodard* and the majority agree that a subspecialty is a specialty within a specialty, or, stated otherwise, a more specialized specialty.

Despite these similar definitions of "subspecialty," the majority holds, contrary to *Woodard*, that the requirements in MCL 600.2169 for specialties and specialists do not apply to subspecialties and subspecialists.  Rather, the majority holds that to satisfy MCL 600.2169(1), an expert need only have the same general "specialty" as the defendant doctor and spend a majority of their time in that specialty, not any specific subspecialty.

The majority's reasoning on this particular point is rather slim.  Other than the definitions of "board certified" that the majority relies on to tie board certification to specialties recognized by various certifying organizations, the majority supports its conclusion that "specialty" does not encompass "subspecialty" only by noting that the Legislature could have used the phrase "subspecialty," as it did in MCL 333.17001(1)(a)(*ii*)(A), which is part of the Public Health Code.  The majority thus

---

[8] *Ante* at 14.  The Free Dictionary defines "subspecialty" as "[a] narrow field of study or work within a specialty," though the majority quotes only "within a specialty."  The Free Dictionary, Medical Dictionary, subspecialty <https://medical-dictionary.thefreedictionary.com/subspecialty> (accessed July 1, 2024) [https://perma.cc/E2N5-9AF4].

concludes that " 'specialties' and 'subspecialties' are linguistically distinctive and separate terms, and the addition of a prefix changes the meaning of the original term."[9]

The majority hardly needs to explain that "specialty" and "subspecialty" are different words, though—of course they are. But as *Woodard* explained, the definition of "specialty" encompasses subspecialties as well. While the Legislature could have been clearer by referring to "the same specialty *or subspecialty*" in MCL 600.2169(1), and I do not doubt that the Legislature was aware of the word "subspecialty," my point is that it did not need to say "subspecialty" specifically because a subspecialty is a type of specialty.

The majority concedes that the use of "subspecialty" in MCL 333.17001(1)(a)(*ii*)(A) "is not dispositive given that the Public Health Code is unrelated to the provisions of the Revised Judicature Act at issue in this case" and "demonstrate[s] that the two words are different and that the Legislature understands how to use them."[10] But I do not even find the use of "subspecialty" in the Public Health Code persuasive. MCL 333.17001(1)(a)(*ii*)(A) contains one buried mention of "subspecialty."[11] Insofar as the

---

[9] *Ante* at 13.

[10] *Ante* at 13 n 8.

[11] The statute states, in relevant part:

> (1) As used in this part:
>
> (a) "Academic institution" means either of the following:
>
> * * *
>
> (*ii*) A hospital licensed under article 17 that meets all of the following requirements:
>
> (A) Was the sole sponsor or a co-sponsor, if each other co-sponsor is either a medical school approved by the board or a hospital owned by the

majority uses the Public Health Code's use of "subspecialty" to construe § 2169(1), this Court has previously warned that "reliance on an unrelated statute to construe another is a perilous endeavor to be avoided by our courts." *Grimes v Dep't of Transp*, 475 Mich 72, 85; 715 NW2d 275 (2006). Under MCL 8.3a, technical words "shall be construed and understood according to [their] peculiar and appropriate meaning." In this case, the words "specialty" and "subspecialty" are defined in medical dictionaries. We need only consider those definitions. In any case, it is quite possible—if not likely—that the Legislature, years after it mentioned "subspecialty" in one passage of the Public Health Code,[12] did not deliberately choose to use "specialty" to exclude "subspecialty" in § 2169.[13]

## 2. TYING SPECIALTIES AND SPECIALISTS TO BOARD CERTIFICATION

I am also skeptical of the majority's holding that "the words 'specialist' and 'specialties' as used in MCL 600.2169(1) are defined as the specialties recognized by the

___

federal government and directly operated by the United States Department of Veterans Affairs, of not less than 4 postgraduate education residency programs approved by the board under section 17031(1) for not less than the 3 years immediately preceding the date of an application for a limited license under section 16182(2)(c) or an application for a full license under section 17031(2), if at least 1 of the residency programs is in the specialty area of medical practice, or in a specialty area that includes the *subspecialty* of medical practice, in which the applicant for a limited license proposes to practice or in which the applicant for a full license has practiced for the hospital. [MCL 333.17001 (emphasis added).]

[12] As the majority recounts, "specialty" and "subspecialty" have been used in MCL 333.17001(1)(a)(*ii*)(A) since 1990, see 1990 PA 247 and 1990 PA 248; cf. 1978 PA 368. The current version of MCL 600.2169 was passed in 1993. See 1993 PA 78.

[13] Other courts agree with *Woodard*. See *Baker v Univ Physicians Healthcare*, 231 Ariz 379, 386; 296 P3d 42 (2013) (citing *Woodard* and stating, "As commonly understood, a 'subspecialty' is a more focused area of practice encompassed by a broader specialty, but the subspecialty is itself a specialty").

10

American Board of Medical Specialties (ABMS), the American Osteopathic Association (AOA), the American Board of Physician Specialties (ABPS), or other similar nationally recognized umbrella-based physician certifying entities."[14]  I am not convinced that we should so definitively tie specialties and specialists to board certifications.

To reach its conclusion that "the words 'specialist' and 'specialties' as used in MCL 600.2169(1) are defined as the specialties recognized by the ABMS, AOA, ABPS, or other nationally recognized physician umbrella-certifying organizations,"[15] the majority relies on the definitions of "board certification" in acts outside the RJA, of which MCL 600.2169 is a part.[16]  But these definitions of "board certification" from other acts do not fully support

---

[14] *Ante* at 2.

[15] *Ante* at 27.

[16] It is ironic that the majority opinion relies so heavily on the definitions of the "ABMS, AOA, ABPS, or other nationally recognized physician umbrella-certifying organizations" when the American Medical Association (AMA) filed an amicus brief supporting *Woodard*'s interpretation of MCL 600.2169, arguing that "*Woodard* correctly held that a subspecialty is a specialty" and opposing the majority opinion's interpretation.  Further, the ABMS's amicus brief in *Woodard* argued that a subspecialty was the same thing as a specialty.  See Brief for ABMS as Amicus Curiae (October 17, 2005), p 3 (' "[B]oard certified' and 'specialty' as used in MCL § 600.2169(1)(a) should include certification in a primary specialty as well as certification in any one of the ABMS recognized subspecialties.").  See also *id*. ("The term 'board certified' applies equally to those physicians certified in a primary specialty and those who attain certification in one of the[ABMS['s] recognized subspecialties, because the requirements to obtain subspecialty recognition are as rigorous as the requirements for a primary certificate.  Likewise, [the] ABMS requirements for recognition of a primary specialty are essentially the same as its requirements for a subspecialty.").  The AMA and the ABMS jointly founded and staff the Liaison Committee for Specialty Boards (LCSB).  The LCSB is the organization that defines specialties and subspecialties.  Thus, the majority opinion shows faux deference to "physician umbrella-certifying organization[s]" on the one hand, while on the other hand ignoring the arguments of two primary physician umbrella-certifying organizations on which it purports to rely.

11

the conclusion that a specialty must always relate to a board certification. It is true that those definitions all define "board certification" as related to a specialty.[17] But that board certification always relates to a specialty does not logically mean that all specialties must relate to board certifications.

Further, I would not rely on definitions of "board certified" from other statutes to interpret the instant statute, as the majority does. *Woodard* specifically refused to consider the definition of "board certified" from the Public Health Code, MCL 333.2701(a), noting that "the Legislature specifically limited the use of the Public Health Code's definition of 'board certified' to the Public Health Code by stating, '*As used in this part* . . . "[b]oard certified" means . . . .' " *Woodard*, 476 Mich at 563. MCL 333.2701 still contains the "as used in this part" language, so its definition of "board certified" is confined to the Public Health Code. The other statutes the majority relies on also use this language: MCL 500.2212a(7) and MCL 550.1402a(4) both begin their definitions with "As used in this section," so their definitions of "board certified" are confined to the Insurance Code and the Nonprofit Health Care Corporation Reform Act, respectively. Given the explicitly cabined definitions of "board certified" in these other acts, I believe it is a mistake for the

---

[17] MCL 333.2701 ("As used in this part: (a) 'Board certified' means certified to practice in a particular medical specialty by a national board recognized by the American Board of Medical Specialties or the American Osteopathic Association."); MCL 500.2212a(7) ("As used in this section, 'board certified' means certified to practice in a particular medical or other health professional specialty by the American Board of Medical Specialties, the American Osteopathic Association Bureau of Osteopathic Specialists, or another appropriate national health professional organization."); MCL 550.1402a(4) ("As used in this section, 'board certified' means certified to practice in a particular medical or other health profession specialty by the American board of medical specialties or other national health professional organization.").

majority to rely on them to interpret the terms "specialty" and "specialist" as used in the RJA. Instead, I would continue to follow *Woodard* in not so tightly tying "board certification" to specialties as defined by certifying entities.

Finally, it bears noting that other Courts have followed *Woodard*'s analysis on this point. *Panayiotou v Johnson*, 995 So 2d 871, 876-877 (Ala, 2008), pointed out that different boards sometimes differ in their treatment of an area of medicine, with one board calling an area a subspecialty and another board calling it a specialty.

> The interpretation of the term "specialty" [that would recognize a distinction between specialty and subspecialty], if adopted, would be problematic in its application because it fails to recognize that some areas of medicine may technically be deemed "subspecialties" by some boards, but recognized as specialties by others. For example, in *Chapman v. Smith*, 893 So.2d 293 (Ala.2004), this Court recognized that the defendant anesthesiologist was certified in the specialty field of pain management by the American Academy of Pain Management ("AAPM"), a non-ABMS board. ABMS does not recognize pain management as a "specialty" under its taxonomic scheme; however, the relevant ABMS board, the American Board of Anesthesiology, does recognize "pain medicine" as a "subspecialty." [*Id*. at 876-877.]

The majority does not consider this potential difficulty.

In sum, I disagree with the majority's conclusion that specialties under § 2169 must always correlate to the specialties set out by nationally recognized certifying entities. Additionally, I see problems with the reasoning on which the majority bases its conclusion that "specialty" excludes "subspecialty." That there is only one use of the term "subspecialty" in another act, enacted years prior to the one at issue here and specifically limited to that act only, is not strong evidence that the Legislature intended to use "specialty" in § 2169 as specifically excluding "subspecialty," particularly when, as *Woodard* explained, the definition of "specialty" encompasses "subspecialty." Finally, the

13

majority's conclusion that "specialty" does not include "subspecialty" could lead to problems when different certifying entities label an area of practice differently.

## B. SUBSECTIONS (2) AND (3) OF MCL 600.2169

The majority believes that *Woodard* erroneously rendered MCL 600.2169(2) and (3) effectively null. Those subsections state:

> (2) In determining the qualifications of an expert witness in an action alleging medical malpractice, the court shall, at a minimum, evaluate all of the following:
>
> (a) The educational and professional training of the expert witness.
>
> (b) The area of specialization of the expert witness.
>
> (c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.
>
> (d) The relevancy of the expert witness's testimony.
>
> (3) This section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section.

These subsections provide other grounds, in addition to those in Subsection (1), on which a court may disqualify an expert. Subsection (2) lists other factors the court should consider when evaluating an expert, and Subsection (3) simply notes that the court retains any other power it might have to disqualify an expert.

The majority relies on these subsections seemingly to rebut the concern that its interpretation of Subsection (1), which reads the statutory requirements as less burdensome than *Woodard* did and makes them easier to meet, will lead to impractical results. Further, the majority contends that *Woodard*'s interpretation of Subsection (1) as requiring a

14

matching of subspecialties prohibits qualified experts from testifying and "effectively nullified" Subsections (2) and (3).[18]

I agree with the majority on this point of the newfound functional importance of Subsections (2) and (3) under the majority's scheme. Under the majority's new interpretation of Subsection (1), Subsections (2) and (3) will play a much bigger role. Trial courts will have to exercise their discretion under those subsections much more frequently, as many more experts will meet the requirements of Subsection (1).

However, I take issue with the majority's accusation that *Woodard* rendered Subsections (2) and (3) nugatory. Subsections (2) and (3) could well come into play even if an expert meets *Woodard*'s more stringent requirements of Subsection (1). It is possible that an expert who spends over 50% of their professional time in the relevant specialty could have subpar educational and professional training, § 2169(2)(a); might not have practiced for very long, § 2169(2)(c); or might, despite their relevant qualifications, offer irrelevant testimony, § 2169(2)(d). The various grounds listed in Subsection (2) would thus provide the trial court with a rationale to exclude the expert's testimony.

The majority opinion critiques *Woodard*'s interpretation of § 2169 because it necessarily leads to some overlap between the various subsections of § 2169. But it is undisputed that § 2169's subsections overlap with each other. Subsection (2)(b) states that a court must consider the expert's area of specialization. But this overlaps with Subsection (1)(a)'s requirement that an expert "specializes . . . in the same specialty as the party against whom or on whose behalf the testimony is offered." Subsection (3) also overlaps

---

[18] *Ante* at 20.

15

with Subsection (1), as the "majority of his or her professional time" requirement goes to show that an expert bases their opinion on "sufficient facts or data," MRE 702(b), which the Court could consider under § 2169(3). That Subsections (2) and (3) are somewhat duplicative of the requirements of Subsection (1) and that a trial court may not often need to rely exclusively on Subsections (2) and (3) is simply a quality inherent in § 2169, not evidence that *Woodard* was wrong in failing to give full effect to Subsections (2) or (3).

But *Woodard* did comment that Subsections (2) and (3) would still play a role. *Woodard*, 476 Mich at 574 ("[E]ven when a proffered expert meets the criteria contained in § 2169(1), the expert is subject to further scrutiny under § 2169(2) [and] § 2169(3) . . . ."). Additionally, Justice MARKMAN's concurrence in *Woodard* explicitly addresses the use of Subsections (2) and (3) under the majority opinion in that case. He explained:

> [I]f the defendant physician specializes in two specialties and both of these specialties are relevant, i.e., the defendant physician's actions were informed by both specialties at the time of the alleged malpractice, the trial court may well conclude that, although the plaintiff's expert witness is qualified under § 2169(1) because he specializes in the one most relevant specialty, he may not be qualified under § 2169(2) or MRE 702 [which would be invoked via § 2169(3)] because he does not specialize in both relevant specialties. [*Woodard*, 476 Mich at 582 (MARKMAN, J., concurring).]

Justice MARKMAN believed that even with the *Woodard* majority's "one most relevant specialty" test applying to Subsection (1), it was possible that a defendant physician might specialize in more than one specialty and that more than one specialty might be relevant. In such a case, a court would consider whether an expert meets not only the requirements of Subsection (1), but also the requirements of Subsections (2) and (3). In other words, Justice MARKMAN explicitly sets out how Subsections (2) and (3) provide

16

additional grounds to disqualify an expert, even under *Woodard*'s stricter reading of Subsection (1).[19] In light of these explanations, I believe the majority exaggerates in saying that *Woodard* rendered Subsections (2) and (3) nugatory.

## IV. STARE DECISIS

"Stare decisis is short for *stare decisis et non quieta movere*, which means 'stand by the thing decided and do not disturb the calm.' " *Petersen v Magna Corp*, 484 Mich 300, 314; 773 NW2d 564 (2009) (opinion by MARILYN KELLY, C.J.). "Under the doctrine of stare decisis, 'principles of law deliberately examined and decided by a court of competent jurisdiction should not be lightly departed.' " *McCormick v Carrier*, 487 Mich 180, 209-210; 795 NW2d 517 (2010), quoting *Brown v Manistee Co Rd Comm*, 452 Mich 354, 365; 550 NW2d 215 (1996). "Stare decisis is generally 'the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.' " *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000) (citation omitted). Indeed, Alexander Hamilton championed the value of stare decisis, noting that to " 'avoid an arbitrary discretion in the courts, it is indispensable that [courts] should be bound down by strict rules and precedents which serve to define and point out

---

[19] The majority agrees with Justice MARKMAN's analysis that Subsections (2) and (3) of MCL 600.2169 could be used to disqualify an expert if there is more than one relevant specialty. But the majority contends that *Woodard* still rendered Subsections (2) and (3) "effectively nugatory" because there has seemingly not been much litigation regarding those subsections. *Ante* at 21 n 20. I grant that under *Woodard* Subsections (2) and (3) play a smaller role than they will under the majority's definition. But playing a more limited role does not render them effectively nugatory.

their duty in every particular case that comes before them . . . .' " The Federalist No. 78 (Hamilton) (Rossiter ed, 1961), p 471.

Although there is a recognized preference for stare decisis, the doctrine should not "be applied mechanically to forever prevent the Court from overruling earlier erroneous decisions determining the meaning of statutes." *Robinson*, 462 Mich at 463. Rather, courts must be mindful that in considering whether to apply stare decisis or overrule precedent, there are two competing values—stability versus the need to correct errors. *Petersen*, 484 Mich at 314 (opinion by MARILYN KELLY, C.J.). In other words, "there is a presumption in favor of upholding precedent, but this presumption may be rebutted if there is a special or compelling justification to overturn precedent." *McCormick*, 487 Mich at 211, citing *Petersen*, 484 Mich at 319-320.

As a preliminary matter, courts must determine whether the case was wrongly decided. *Rowland v Washtenaw Co Rd Comm*, 477 Mich 197, 215; 731 NW2d 41 (2007), citing *Robinson*, 462 Mich at 464. If so, we proceed to consider the following factors: "whether the prior decision defies 'practical workability,' " reliance interests, and "whether changes in the law or facts no longer justify the prior decision . . . ." *Rowland*, 477 Mich at 215, quoting *Robinson*, 462 Mich at 464. Given my earlier analysis, I do not believe that *Woodard* was wrongly decided on the points that the majority raises. Assuming though that *Woodard* was wrongly decided, the factors of the stare decisis test strongly counsel in favor of retaining *Woodard*.

First, workability "involves the reception of the decision by courts and parties and the ease of its application." *Ottgen v Katranji*, 511 Mich 223, 240; 999 NW2d 359 (2023). "Considerations that are relevant to this analysis include whether the decision has been met

18

with criticism, whether its application has been contested or difficult, and, in the context of statutory interpretation, whether a reader of the underlying statute would be unable to rely on its plain meaning in light of the decision's departure from that meaning." *Id*.

I believe that *Woodard* interpreted MCL 600.2169 in accordance with its plain meaning such that a reader of the statute could rely on the statute's own language. I recognize that *Woodard* has been criticized.[20] However, it also bears noting that *Woodard* was largely unanimous on the points the majority now focuses on—the definitions of "majority" and "specialty."[21] More importantly though, I believe that *Woodard* is relatively easy to apply.

The majority points to the results in these two cases as proof that *Woodard* defies practical workability. I am unconvinced, though, of the majority's claim that the results in these two cases are so impractical. For example, in *Selliman*, though otolaryngologists and specialists in facial plastic and reconstructive surgery both perform rhinoplasties, the rhinoplasty in the case was clearly cosmetic and thus unsurprisingly falls under the

---

[20] See *Kiefer v Markley*, 283 Mich App 555, 559-560; 769 NW2d 271 (2009); *id*. at 563-564 (O'CONNELL, J., dissenting); *Johnson v Bhimani*, unpublished opinion of the Court of Appeals, issued February 10, 2011 (Docket No. 292327) (GLEICHER, J., dissenting); *LeBlanc Estate v Agnone*, unpublished opinion of the Court of Appeals, issued July 6, 2017 (Docket No. 330330) (RONAYNE KRAUSE, J., concurring in part and dissenting in part); *Perez Estate v Henry Ford Health Sys*, unpublished opinion of the Court of Appeals, issued December 4, 2018 (Docket No. 340082) (SHAPIRO, J., dissenting); *Higgins v Traill*, unpublished opinion of the Court of Appeals, issued July 30, 2019 (Docket No. 343664) (GLEICHER, J., concurring).

[21] *Woodard* was focused on interpreting Subsection (1), so the *Woodard* majority did not thoroughly address Subsections (2) and (3).

specialty of facial plastic and reconstructive surgery.[22] I am not completely sure physicians would approach the procedure with the same standard of care given the two different goals of facial plastic and reconstructive surgery versus otolaryngology, i.e., either to improve appearance or to improve function. Again, having no medical degree, I am simply unwilling to express any definitive view on the matter. Suffice it to say, I do not think the Court of Appeals result in *Selliman* is so practically unworkable. It sets a clear line that a putative expert must specialize in the same subspecialty as the defendant. This bright-line rule is easy to apply, unconfusing, and makes practical sense.

In *Stokes*, I also believe it makes sense to consider neuroradiology the relevant specialty. Granted, this is largely because I believe that *Woodard*'s definition of "specialty" and "subspecialty" is correct insofar as no board certification is required to be a specialist. I therefore do not believe that defendant's lapsed CAQ in neuroradiology necessarily indicates that he was not a subspecialist in that area. It hardly defies practical workability to hold that the most specific applicable subspecialty, which the defendant generally practiced in and was practicing at the time of the alleged malpractice, is the relevant one that must be matched by the expert. Additionally, the majority affirms the Court of Appeals' result in *Stokes*. It is hard to believe that *Woodard* is unworkable when it leads to the same result the majority reaches.

However, even if we grant that the results in the instant cases seem strange, creating strange results in two cases is a far cry from wholly defying practical workability. Rather, I tend to believe that *Woodard*, insofar as it provides hard-and-fast rules, is practically very

---

[22] I assume that facial plastic and reconstructive surgery is a specialty, as the parties have argued.

workable. Courts must identify the one most relevant specialty (or subspecialty), and an expert must spend more than 50% of their time either practicing or teaching that specialty (or subspecialty). Yes, perhaps sometimes it is difficult to tell the one most relevant specialty, such as in the instant cases when specialties and subspecialties appear to overlap. However, in many cases the relevant specialty or subspecialty is clear, and *Woodard* is easily applied.

In any case, *Woodard*'s rule is much clearer and therefore much more practical than the rule the majority now puts forward. Under the majority's view, so long as an expert is in the same specialty, even if that might be unrelated to the exact subspecialty at issue, the expert satisfies Subsection (1). How courts will deal with potentially conflicting authority regarding whether to classify an area as a specialty or subspecialty remains to be seen. See *Panayiotou*, 995 So 2d at 876-877. Trial court analyses will more often rely on Subsections (2) and (3) when discussing an expert's qualifications. Those provisions give less explicit guidance to trial courts. The shift of emphasis from a clearly, narrowly defined Subsection (1) to Subsections (2) and (3) will lead to less predictable results in medical malpractice cases overall, and, I believe, a significant increase in appeals challenging lower-court decisions under Subsections (2) and (3). An expert may also combine practicing in overlapping specialties to meet the requirements of Subsection (1), though how courts will determine which specialties sufficiently overlap to be counted together toward the "majority" of the expert's time requirement also is yet to be determined. How much time qualifies as a "majority" is another question about which I am curious. At bottom, while *Woodard*, like any bright-line rule, might create harsh results in cases on the margins, I believe that *Woodard*'s great benefit is in its clear-cut definitions and general predictability,

21

which speak to *Woodard*'s practical workability.  For all these reasons, I believe that the first factor counsels in favor of retaining *Woodard*.

Second, reliance interests also suggest that *Woodard* should be retained.  As the majority notes, "the Court must ask whether the previous decision has become so embedded, so accepted, so fundamental, to everyone's expectations that to change it would produce not just readjustments, but practical real-world dislocations." *Robinson*, 462 Mich at 466.  I believe that *Woodard* has reached this level of fundamentality.  It has been in place nearly 20 years and has been the definitive case regarding a complicated and often-litigated statute.  It has been cited upwards of 1,400 times, including almost 400 times by our Court and the Court of Appeals.  The majority relies on *Robinson*'s counsel that when dealing with statutory interpretation, the Court should favor application of the statutory text over retaining a precedent that put forward an erroneous interpretation.  *Id*. at 467.  Though I agree with *Robinson*'s point, I disagree with its application here, as I believe *Woodard*'s interpretation of § 2169 is more faithful to the statutory text than the majority's interpretation.

Finally, we consider whether there have been changes in the law or facts since *Woodard* that would necessitate overruling it.  There have not been.  The statute has not been amended.  No relevant facts have changed.  This factor also counsels in favor of retaining *Woodard*.

In sum, I believe that all three factors favor leaving *Woodard* intact.  Of course substantively I do not agree with the majority's critiques of *Woodard*.  But even if the majority's critiques were correct, there is something to be said for the devil you know.

With that principle in mind, I believe the stare decisis factors counsel strongly in favor of retaining *Woodard* at this juncture.

## V. APPLICATION

### A. *STOKES v SWOFFORD*

The majority believes that the Court of Appeals in *Stokes* reached the right result for the wrong reason. Under the majority's reasoning, diagnostic radiology is the one most relevant specialty because it is the only one the defendant was certified in and practiced. But because only specialties and not subspecialties must align under the majority's view, the expert with a subspecialty in neuroradiology and, more importantly, a specialty in diagnostic radiology can testify.

I believe the Court of Appeals reached the right result for the right reason. Neuroradiology is the one most relevant specialty, as reading images of the brain was what gave rise to the alleged malpractice. As *Woodard* said, a specialist need not be board certified. *Woodard*, 476 Mich at 561. I would not tie specialties to board certifications so closely as the majority does. Consequently, that defendant's CAQ in neuroradiology had lapsed is not definitive—defendant was still practicing neuroradiology by reading the images of plaintiff's brain, and I think it is fair to say he is a neuroradiologist. Because the one most relevant specialty was the subspecialty of neuroradiology and plaintiff's expert spent more than 50% of his time in that subspecialty, the Court of Appeals reached the correct result in holding that the expert could testify. I would affirm the Court of Appeals based on its own reasoning, not that of the majority.

## B.  *SELLIMAN v COLTON*

I also believe that the Court of Appeals reached the right result in *Selliman*.  While the expert and defendant physician had the same board certifications in otolaryngology and facial plastic and reconstructive surgery, the procedure at issue was clearly done for cosmetic reasons, and thus, the latter specialty was the one most relevant specialty.  The expert spent only 10% of his time practicing facial plastic and reconstructive surgery, so he did not spend "a majority of his . . . professional time" in the one most relevant specialty.  MCL 600.2169(1)(b).  Therefore, I believe that under *Woodard* the Court of Appeals was correct.[23]

---

[23] The majority notes that facial plastic and reconstructive surgery is a certification available to physicians after they have been certified in otolaryngology or plastic surgery. The majority then remands *Selliman* to the trial court to decide whether facial plastic and reconstructive surgery is a specialty or subspecialty.

I note that the Court of Appeals treated both otolaryngology and facial plastic and reconstructive surgery as specialties.  See *Selliman*, unpub op at 6 (identifying facial plastic and reconstructive surgery as the most relevant specialty).  In their briefs here, the parties accept that facial plastic and reconstructive surgery is a specialty, with neither party arguing that it is instead a subspecialty.  Plaintiff explicitly said that defendant and plaintiff's expert were identically board certified and that "[u]nlike many of the cases discussed herein, which concern specialties and subspecialties of the [ABMS], this case concerns two distinct board certifications."  Plaintiff's Supplemental Brief (June 8, 2022), p 29 n 4.  See also Defendant's Supplemental Brief (July 13, 2022), p 28 ("The specialty in which Dr. Colton was engaged was facial plastic and reconstructive surgery, not ENT [ear, nose, and throat; i.e., otolaryngology].") (boldface omitted).  As plaintiff points out, there is a board certification in facial plastic and reconstructive surgery.  That there is a board certification, which is typically associated with a specialty, rather than a CAQ, which is typically associated with a subspecialty, suggests that facial plastic and reconstructive surgery is only a specialty.

## VI.  CONCLUSION

In sum, I disagree with the majority's substantive arguments regarding the merits of *Woodard*.  I believe *Woodard* correctly defined "specialty" as including "subspecialty" and did not effectively negate Subsections (2) and (3) of § 2169.  Furthermore, I would not overrule *Woodard* in part, as the majority now does, due to stare decisis concerns.  *Woodard's* rules are more administrable than those the majority now puts forward, and I therefore believe *Woodard* is worth keeping.  For these reasons, I dissent, as I would affirm the Court of Appeals in both cases.

Elizabeth T. Clement
Brian K. Zahra
David F. Viviano